UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CORY LEMARBE,

                    Plaintiff,                        Case Number 19-12992

v.                                            Honorable David M. Lawson

VILLAGE OF MILFORD,

                    Defendant.

_____/

## OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT

Plaintiff Cory LeMarbe was employed in the Village of Milford's maintenance department since 2014. He was fired in 2019. He brought this action alleging disability discrimination and retaliation, contending that the Village failed to accommodate his reasonable request for transfer to a more suitable work assignment, and then terminated him pretextually when he threatened to sue over the failure to accommodate. The defendant has moved for summary judgment, arguing that the plaintiff cannot prove all the elements of these claims. However, the plaintiff has identified evidence in the record that, if believed, establishes his right to relief. Because there are genuine disputes of material fact, the motion for summary judgment will be denied.

I.

The remote background of the plaintiff's employment with the Village is undisputed. LeMarbe worked for the Village of Milford since 2014. In 2015, he was hired to work in the Village's Maintenance Department in a full-time position under supervisor Robert Calley, who was the Director of Public Services for the Village. From October 2015 through September 2018, LeMarbe worked in the DPS Garage, where he performed well in all of his duties, generally received favorable evaluations, and had no disciplinary record. From that point, the parties' accounts diverge.

LeMarbe attested in an affidavit that his doctor has diagnosed him with a "moderate to severe" condition of essential tremors, which he has had for 15 to 20 years.  Cory LeMarbe aff., ECF No. 45-14, PageID.1150.  He stated that his hand tremors are so severe that they preclude him from, among other things, drinking hot beverages except from a container with a secure lid, that he cannot eat cereal, soup, rice, salad, or any other food that requires "precision maneuvers" of utensils with his hands to consume, and that he cannot button a shirt, so he wears only pullover shirts with no buttons.  He also is unable to write because his hands shake so badly, and when he tries to write the results are illegible.

In September 2018, LeMarbe was reassigned to work in the Wastewater Department.  According to LeMarbe, he was told by Calley initially, in September 2018, that Calley needed LeMarbe to work in the Wastewater Department "for a couple of weeks," so that Calley could train two new employees who had been hired and who would be assigned initially to the DPS Garage, where LeMarbe had been working.  LeMarbe testified that the DPS Garage and Wastewater Department essentially were "all one department," with the only distinction being in the location of work assignments and nature of the specific work duties.  Although the assignment to the Wastewater Department initially was styled by Calley as temporary, it wound up lasting for several months.

In early October 2018, several weeks after LeMarbe was reassigned to the Wastewater Department, he asked Calley to transfer him back to the DPS Garage as agreed.  Calley responded, "I'll get you out of there as soon as possible. Let me just — I got some things working on [sic] with these guys. I'll get you out of there."  LeMarbe dep. at PageID.987.  Over the next several months, LeMarbe asked repeatedly to be reassigned to the DPS Garage.  He asked for a transfer twice in each month from October 2018 through January 2019, and he requested a transfer twice

again in February 2019. LeMarbe made all of those requests because he knew that eventually he would be expected to work in the Wastewater lab, and he anticipated that his tremors would prevent him from performing the duties that would be assigned there.

When LeMarbe presented his third request to Calley to be sent back to the DPS Garage, Calley lost his temper and started shouting profanities, yelling, "You don't F'ing tell me how to run my staff. I'll F'ing do what I want with my F'ing staff." Calley then "walked away got in his truck and left." LeMarbe dep. at PageID.989. LeMarbe testified that after that encounter he "knew [Calley] wasn't going to move me back," but he persisted in requesting the transfer, and eventually, after Calley's blow up, he presented several grievances through his union, in an attempt to appeal the issue of his transfer request to the attention of the Village Manager, Christian Wuerth. LeMarbe subsequently discussed with Wuerth his desire for a transfer back to the DPS Garage, but Wuerth "said nothing" in response to that request.

LeMarbe attested that his conversation with Wuerth touched on several concerns that LeMarbe had about working with Calley, including Calley's inability to follow work rules, his habit of drinking socially with department staff — problematic for LeMarbe, who is a recovering alcoholic — and his concern that Calley wanted to fire him. LeMarbe admitted that he did not mention to Wuerth any specific concerns about being unable to work in the lab due to his tremors, but he did state that he wanted to be reassigned to his old job as promised by Calley, because he was "more comfortable" with the work there. None of LeMarbe's transfer requests met with satisfactory results. During subsequent conversations with supervisor Tom Harder and Calley, when LeMarbe again brought up his desire for a transfer back to the DPS Garage, and his concerns about doing the expected work in the Wastewater lab, their only responses were "you can do it," and "you'll be able to do it." *Id.* at PageID.989.

As LeMarbe had anticipated, after several months of performing other duties in the Wastewater Department, the plaintiff eventually was assigned in early 2019 to work in the Wastewater Department laboratory.  LeMarbe's previous work in the Wastewater Department had entailed other duties that he performed successfully, but LeMarbe attested that it was expected that all employees of the department would at some point also work in the lab.  The routine duties that LeMarbe was assigned outside of the lab essentially were the same work that he had done successfully in the DPS garage, such as maintaining machinery and facilities and performing general cleanup and outdoor landscaping.  In the Wastewater lab however, unlike in his prior assignments, the work required handling liquid samples in delicate glassware and dispensing precise measurements of reagents with pipettes to perform laboratory tests.  While working in the lab, LeMarbe reported directly to supervisor Tom Harder, and he worked alongside another technician, Heather Sherwood.

Predictably, LeMarbe had difficulties performing the lab work due to his tremors. LeMarbe testified that he was unable to perform any of the laboratory testing procedures properly due to his hand tremors.  He was expected to perform a number of procedures such as tests for bio-oxygen demand, fecal coliform and chloride assessments, and tests for levels of ammonia and phosphorous.  However, he was not able successfully to perform any of those procedures. Sometimes LeMarbe worked in the lab with another person, such as Harder, and those times he was able to complete some tests, when the other person performed the steps that LeMarbe could not perform himself.  LeMarbe also attested that, in addition to Harder's direct observation of LeMarbe's difficulties handling lab procedures, both Harder and Calley were aware previously of LeMarbe's tremor condition, because both had occasion to see LeMarbe's hands shaking in other settings, such as when he would eat or drink at lunch.

On February 19, 2019, shortly after the lab assignment began, LeMarbe asked Tom Harder for a meeting with LeMarbe, Harder, and Calley, to discuss the problems that LeMarbe's tremors were causing him with his new assignment in the lab.  The meeting occurred on February 20, 2019, during which LeMarbe told both of his supervisors that he was unable to do the work expected in the lab due to his tremors, and he wanted to be transferred back to the DPS Garage as promised. Harder and Calley responded that there was "no job available" in the DPS Garage for LeMarbe to be reassigned.  However, LeMarbe attested that according to the union contract, and because DPS and Wastewater were essentially the same department, workers could be reassigned within the department at will — as he had been in September 2018 — without any need to create a new position or displace an employee from an existing job.  LeMarbe had worked with Harder in the lab on February 20, 2019, before the meeting with Harder and Calley, and Harder had seen that LeMarbe was unable to do the lab work due to his hands shaking.  On the following day, Harder again worked alongside LeMarbe in the lab, and again witnessed the struggles he encountered due to his hand tremors.

On February 21, 2019, shortly after a department luncheon, Harder approached LeMarbe and informed him that he had been told by Wuerth to "write him up" for "inability to do his job" in the lab "because of your hands."  LeMarbe dep. at PageID.1005-06.  LeMarbe responded by telling Harder that he would "file charges with the EEOC" and "file charges with the state labor board," and he also said that he would "go to Christian Wuerth's office and knock on his door and tell him Bob [Calley] was fornicating with his secretary on the clock."  *Id.* at PageID.1006. LeMarbe was scheduled to work in the lab alone on February 22, 2019.  LeMarbe reported to work in the lab on the morning of February 22, 2019, but because he was alone, he was unable to perform

any of the usual lab procedures. Around 1-1/2 hours after he reported to work, LeMarbe was informed that he was being placed on administrative leave, and he was sent home.

The record includes an administrative leave memorandum authored by Calley on February 22, 2019, in which Calley wrote to LeMarbe: "Yesterday afternoon, I was made aware of several incidents involving you making threatening statements to coworkers, including threats of physical violence." Memorandum dated Feb. 22, 2019, ECF No. 45-9, PageID.1129. The memo advised LeMarbe that he was being placed on administrative leave pending an investigation of the allegations.

On March 6, 2019, during his administrative leave, LeMarbe submitted a written complaint to the attention of the Village Manager, stating that he was refused an accommodation for his disability in the form of a transfer back to the DPS Garage, that he was mocked and harassed by coworkers due to his hand tremors, and that he believed the administrative leave was retaliatory.

On March 20, 2019, Village Manager Christian Wuerth informed LeMarbe via letter that he was being terminated for threatening or intimidating conduct, which consisted of the following:

a) On or about December 28, 2018, you verbally threatened and/or intimidated coworker Heather Sherwood by yelling at her, and by stating words to the effect that, "I wouldn't fuck with me if [I] were you Heather."

b) On or about February 7, 2019, you verbally threatened and/or intimidated coworker Heather Sherwood by yelling at her, asking her if she wanted to fight, moving aggressively toward her, and invading her personal space.

c) On or about February 9, 2019, you made an unsubstantiated accusation against coworker Heather Sherwood to her direct supervisor, the Assistant Director of Public Services, by stating that she was dishonorably discharged from military service due to drug and/or alcohol abuse.

d) On or about February 21, 2019, in response to an unrelated question from the new AFSCME Steward about the time period for retention of written disciplinary actions, you went into a rant, and proceeded to make verbal threats, including an allegation that the DPS Director had engaged in an illicit sexual relationship with another employee.

Letter dated Mar. 20, 2019, ECF No. 45-11, PageID.1134.  The letter further stated that the termination was due to conduct violating the collective bargaining agreement provisions that allowed immediate termination of an employee for any "act which jeopardizes the health or safety of a citizen or fellow employee while performing duties for the Village," "use of, threat or intimidation of physical violence while performing duties for the Village," and "use of, threat or intimidation or political pressure of any kind."  *Id.* at PageID.1134-35.

Christian Wuerth testified about the employee statements that he reviewed that prompted the termination.  Heather Sherwood provided a statement dated February 26, 2019, which Bob Calley told her to write up, summarizing "incidents" she recalled with LeMarbe.  In the statement, Sherwood reported that the December 28, 2018 incident she understood to be a threat that LeMarbe would report her to DPS supervisors for bothering him about calling in sick when he did not want to work in the lab.  Wuerth admitted that the December incident was reported as an "argument" that did not involve any threat of physical violence, and that it would be permissible for an employee to report a coworker to supervisors over a work-related argument.  Wuerth also testified that he never heard any other complaints from Sherwood about incidents with LeMarbe until he directed Calley to solicit statements from employees about incidents with LeMarbe.

Wuerth had a meeting with LeMarbe on March 14, 2019, to discuss the allegations of threats and intimidation, and during their discussion LeMarbe denied ever physically intimidating or threatening coworkers with physical violence, and he also denied the other allegations against him.  Wuerth admitted that he could not recall the source of information for the allegation that LeMarbe had told Tom Harder that Sherwood was dishonorably discharged, but he supposed that the information must have come from notes submitted to him by Harder.  Wuerth also admitted that when the disciplinary process was commenced, Calley did not inform Wuerth about

LeMarbe's February 21, 2019 statement that he would sue the Village over the failure to accommodate his disability, even though a diary of departmental incidents that was kept by Harder memorialized the threat to sue.

Robert Calley testified that he was aware of the alleged confrontations with Sherwood before February 26, 2019, but it had been reported to him that the run-ins were not serious and Sherwood and LeMarbe were working with Harder to iron out their differences, and they were "trying to keep management out of it." Robert Calley dep., ECF No. 45-4, PageID.1062. He never undertook any further investigation of the incidents with Sherwood or any other allegations of physical confrontations with other employees before February 26, 2019, when he solicited statements from Sherwood and other employees, after LeMarbe had been placed on administrative leave.

Heather Sherwood testified that she did not regard anything in the December 28, 2018 confrontation with LeMarbe as involving any physical threat or intimidation; she understood his remark to mean that he would report her to supervisors for bothering him about his use of sick time. She testified, however, that during the second confrontation on February 7, 2019, during an argument about Sherwood's attempts to train LeMarbe on lab procedures, LeMarbe had "bulked up," and "walked toward me and asked if I wanted to fight," which she felt was physically intimidating. *Id.* at PageID.1047. However, the two then "backed up," and "began to get loud and argue." *Ibid.* Sherwood testified that she did not report the confrontation to anyone, but later, after LeMarbe went to talk to Calley about difficulties with Sherwood in the lab, there was a discussion between the three which resulted in "[coming] up with another training plan." *Ibid.* Sherwood testified that "there was not another incident after that." *Ibid.*

As to the accusation that Sherwood was dishonorably discharged, LeMarbe testified that he never told anyone that Sherwood had a substance abuse problem, and, as a recovering alcoholic, he would not have spread such rumors or allegations, because he "believe[s] in anonymity," due to his own struggles with alcohol dependency and recovery.  LeMarbe testified that another coworker had spread rumors about Sherwood, and Harder had repeated the rumors to LeMarbe, but LeMarbe did not repeat them himself.

After unsuccessfully seeking relief from the Equal Employment Opportunity Commission (EEOC), LeMarbe filed his complaint in this Court alleging discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.* (count I), and the Michigan Persons with Disabilities Act, Mich. Comp. Laws § 37.1101, *et seq.* (count II), and retaliation under both laws (count III).  After discovery closed, the defendant moved for summary judgment on all counts. The Court heard oral argument on August 5, 2021.

II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Id.* at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). Instead, that party must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for" that party. *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The party who bears the burden of proof must present a jury question as to each element of its claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quoting *PDV Midwest Ref., LLC v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

As noted above, the plaintiff brings his claims under both federal and state law.  The state law counterpart to the ADA, the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws § 37.1101, *et seq.*, "'substantially mirrors the ADA.'"  *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002)).  Therefore, the analysis of the ADA claims "generally, [al]though not always, [will] resolve the plaintiff's PWDCRA claim."  *Ibid.*

## A.  Discrimination

LeMarbe alleges that Milford discriminated against him under the ADA by failing to return him to his job in the DPS garage as an accommodation to address his essential tremors and the resulting difficulty they caused him performing certain duties in the Wastewater laboratory.  The parties agree on the basic elements that the plaintiff must prove to prevail on his reasonable accommodation claim.  Where an employee "alleges that [his employer] discriminated against [him] because of [his] disability by failing to offer a reasonable accommodation, [the Court] analyze[s] [his] claim under the direct-evidence framework, which requires that [the employee] establish that (1) []he is disabled, and (2) that []he is otherwise qualified for the position despite [his] disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 417 (6th Cir. 2021) (quoting *Fisher v. Nissan North Am., Inc.*, 951 F.3d 409, 417 (6th Cir. 2020); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007) (quotation marks omitted)).

The defendant does not argue, and there appears to be no significant dispute, that the plaintiff otherwise was qualified to be employed by Milford's Public Works division, either with or without an accommodation in his specific work assignment.  It is undisputed that he successfully

performed the duties of his role in the DPS Garage for at least four years before he was transferred

to the Wastewater department.  The defendant, however, challenges the first element of the claim,

arguing that the plaintiff has not sufficiently proven that he either has or was regarded as having a

"disability" as defined by the ADA.

### 1. Disability

The defendant opens its brief on this point with the faulty premise that case law calls for a

"narrow construction" of the statutory term "disability," relying on *Jamison v. Dow Chem. Co.*,

354 F. Supp. 2d 715, 727 (E.D. Mich. 2004) ("The Supreme Court has held that the qualifiers in

the Act's definition of 'disability' must [be] narrowly construed.") (citing *Toyota Motor Mfg.,*

*Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002)).  It is true that in 2002, the Supreme Court

held that a "major life activity" is an activity of "central importance to daily life."  *Toyota Motor*,

534 U.S. at 197.  But the principle of "narrow construction" applied in that decision was overruled

by the 2008 ADA Amendments Act, which explicitly abrogated the holding of the *Toyota* case

and its progeny.  "Congress disagreed with that definition.  Indeed, one of the reasons Congress

cited for enacting the ADAAA in 2008 was its belief that *Toyota*'s reading of 'disability' was

inappropriately narrow.  *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553

(2008).  Consistent with that, in the findings and purposes section of the bill, Congress expressly

stated that the enactment was designed to overturn the holdings of cases like *Toyota*.  *See id.* at §§

2(a)(4)-(5)."  *Hentze v. CSX Transportation, Inc.*, 477 F. Supp. 3d 644, 660-61 (S.D. Ohio 2020).

Thus, "[i]n 2008, Congress amended the ADA to clarify the 'regarded as' prong of the disability

discrimination statute, broadening the scope of protection originally intended by the ADA." *EEOC*

*v. W. Meade Place, LLP*, 841 F. App'x 962, 966 (6th Cir. 2021) (citing Americans with Disabilities

Amendments Act, Pub. L. 110-325, § 2(a)(4), 122 Stat. 3553 (2008); *Babb v. Maryville*

*Anesthesiologists P.C.*, 942 F.3d 308, 318-19 (6th Cir. 2019) (explaining the history and intent of the 2008 amendments)).

The prevailing definition of "disability" that actually applies "includes three independent prongs: (A) 'a physical or mental impairment that substantially limits one or more major life activities of such individual,' (B) a record of being disabled, or (C) 'because the employer "regards" the employee as disabled.'" *Meade Place*, 841 F. App'x at 966 (quoting 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(2)); *Babb*, 942 F.3d at 318. Thus, the plaintiff in a failure to accommodate case may establish that he qualifies for protection either because he actually has a condition that qualifies as a "disability" within the purview of the statute, or because he was "regarded" by his employer as having a disability. Both criteria were afforded a substantially wider scope by the 2008 amendments to the ADA.

"Section 12102(1)(A) [of Title 42] and its supporting regulations broadly define the term 'disability' for purposes of the ADA." *Darby v. Childvine, Inc.*, 964 F.3d 440, 445 (6th Cir. 2020). The operative definition has three major aspects: "'physical or mental impairment,' 'substantially limits,' and 'major life activities.'" *Ibid.* "'Physical or mental impairment' is defined in federal regulations to include '[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems.'" *Ibid.* (quoting 29 C.F.R. § 1630.2(h)(1)). "The 'degree of functional limitation required for an impairment to constitute a disability' does not 'create a demanding standard.'" *Ibid.* (quoting 29 C.F.R. pt. 1630, App. § 1630.2(j)(1)(iv)). "The "'disability determination [thus is] an appropriate threshold issue but not an onerous burden for those seeking to prove discrimination under the ADA.'" *Ibid.* "In 2008, the term 'major life activity was amended to include the operation of a major bodily function,' including, but not

limited to include, 'neurological functions.'" *McGriff v. Beavercreek City Sch. Dist.*, No. 18-372, 2021 WL 2401921, at *9 (S.D. Ohio June 11, 2021) (quoting 42 U.S.C. § 12102(2)(B)).

"'Substantially limits' is a relative term, one defined in relation to a person's ability to perform a major life activity 'as compared to most people in the general population.'" *Darby*, 964 at 445 (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). "An impairment 'need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.'" *Ibid.*

"'Major life activities' include a non-exhaustive list of activities, including, among other things, caring for oneself, performing manual tasks, and interacting with others." *Darby*, 964 at 445 (citing 29 C.F.R. § 1630.2(i)(1)(i), (2)). "Amendments to the ADA in 2008 sweep even more broadly, adding to that list any 'operation of a major bodily function, including [neurological functions].'" *Ibid.* (quoting 42 U.S.C. § 12102(2)(B); 29 C.F.R. § 1630.2(i)(1)(ii)).

But the plaintiff also may show that, even if he does not have an actual disability, he was "regarded as" having a physical or mental impairment that affected his ability to do his work and warranted some accommodation. "The [2008] amendment makes clear that: '[A]n individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity.*'" *Meade Place*, 841 F. App'x at 967 (quoting 42 U.S.C. § 12102(3)(A)). Thus, after the 2008 amendments, and contrary to the defendant's position, a plaintiff no longer needs to prove that he was "regarded as" having a condition that substantially limited a major life activity, only that he had a physical or mental impairment affecting his work that was known to his employer.

Finally, in explicit contrast with earlier case law, "[f]or cases on the margin, the Act includes a 'rule of construction' that tips in favor of coverage. It instructs that the definition of disability 'shall be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms' of the ADA." *Ibid.* (quoting 42 U.S.C. § 12102(4)(A)).

The plaintiff here has presented sufficient evidence from which a jury reasonably could find, appropriately applying the broad construction called for by the rules of decision cited above, either that he had an actual disability, or that he was regarded as having a physical impairment that affected his work, or both.

### a. Actual Disability

LeMarbe has produced adequate evidence to permit a jury to weigh whether his essential tremors constitute a physical impairment that substantially limits one or more major life activities. The term "[p]hysical or mental impairment [includes] . . . [a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1).

The plaintiff's diagnosed neurological affliction of essential tremors certainly qualifies as a "disorder" or "condition" that "affects" his neurological system. That much is not seriously disputed. The defendant's argument homes in on the criteria of whether the impairment "substantially limits" any "major life activity." "The term 'substantially limits' must be construed 'broadly in favor of expansive coverage,' and a 'major life activity' is not necessarily an activity that is centrally important to daily life." *Woodruff v. Ohio Dep't of Transportation*, No. 18-853, 2021 WL 1338373, at *7 (S.D. Ohio Apr. 9, 2021) (quoting 29 C.F.R. § 1630.2(j)(1)(i), (i)(1)-(2)). In this case, LeMarbe testified that his tremors significantly limit his ability to consume hot and

cold beverages and many ordinary types of food that require "precise manipulation" with utensils to consume.  He also testified that his ability to dress himself is compromised because he cannot don any clothing with buttons.  Finally, he testified that he cannot write by hand, and when he tries to do so, the results are "illegible."  "'Major life activities' include a non-exhaustive list of activities, including, among other things, caring for oneself, performing manual tasks, and interacting with others." *Darby*, 964 at 445 (citing 29 C.F.R. § 1630.2(i)(1)(i), (2)).  The plaintiff has demonstrated significant compromise in several of those activities, including caring for himself, performing manual tasks, and interacting (communicating by writing) with others.  In other cases, less substantial compromise of only one of those activities has been found sufficient to show that essential tremors qualify as a disability.  *See Badgley v. L. Sch. Admission Council, Inc.*, No. 99-0103, 2000 WL 33225418, at *1 (N.D. Tex. Aug. 24, 2000) ("Plaintiff Larry Badgley has hereditary essential tremors affecting both hands. Plaintiff's tremors are a physical impairment that result in loss of fine motor skills. . . . Plaintiff has a [] disability under the ADA because of his essential tremors that substantially limit his major life activity of writing.").

Moreover, the inquiry whether an impairment substantially limits a major life activity generally poses a question of fact for the jury.  Conditions that impair neurological and manual function may fall on either side of the line, and the issue typically is not amenable to being decided as a matter of law.  *Fink v. Printed Cir. Corp.*, 204 F. Supp. 2d 119, 125 (D. Mass. 2002) (holding that evidence that the plaintiff's illness "substantially limited his ability to sleep and think" was sufficient to allow the disability question to be decided by a jury).  LeMarbe has put forth enough evidence here to put the question to a jury.

The defendant cites the Sixth Circuit's decision in *Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439 (6th Cir. 2018), for the proposition that an ADA plaintiff cannot establish that

he has an actual disability without "medical evidence" documenting his condition. There is no such rule of decision recognized by any applicable authority. The defendant says that the *Barlia* decision "upheld" the holding of the district court below that supposedly recognized such a rule. It did no such thing. In fact, the panel *reversed* the district court's ruling that there was insufficient evidence in the record to demonstrate an actual disability, noting that the district court had ignored evidence in the plaintiff's medical records showing that he was prescribed medications appropriate to the condition that he claimed he had. *Barlia*, 721 F. App'x at 445-46. Nothing in the *Barlia* decision establishes any categorical rule that a plaintiff must put forth "medical evidence" of an impairment or its effect on his life activities in order to present his failure to accommodate claim to the jury.

The defendant also contends that the Court should disregard affidavit testimony about the plaintiff's asserted limitations on his life activities on the ground that his deposition testimony conclusively establishes that he is "not limited" in any significant way, and the "sham affidavit" rule bars the filing of affidavits at the summary judgment stage for the purpose of manufacturing a fact dispute. Both aspects of that argument ignore or misconstrue significant testimony in the record.

The "sham affidavit" rule prevents a party from filing an affidavit that "directly contradicts" the party's deposition testimony or that is "in tension with that prior testimony as long as the circumstances show that the party filed the affidavit merely to manufacture a sham fact issue." *Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 842 (6th Cir. 2021) (quotation marks and citation omitted). But the rule "is not intended to 'prevent[] a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit,' which serves to 'fill[] a gap left open by the moving party' and 'provide[] the district court with more information, rather than less, at the crucial summary judgment stage.'" *Johnson v. Ford*

*Motor Co.*, 13 F.4th 493, 501 (6th Cir. 2021) (quoting *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 907 (6th Cir. 2006)).

The record in this case does not support the claimed violation of this rule.  The cited portion of the plaintiff's deposition consisted of the following colloquy about how the plaintiff addresses the subject of his hand tremors in the context of job interviews, where it inevitably becomes immediately apparent that his hands shake significantly:

> Q. Do you say — when you do that, when you have that conversation with someone or make that representation [in a job interview], do you say anything other than I have a tremor disease and it's not life threatening?
>
> A. You know what? Yeah, I'll just say I have a tremor disease. It's not Parkinson's. I tell them it's not Parkinson's. A lot of people, you know — because that's — most people generalize my tremor disease with Parkinson's.
>
> Q. Okay. And do you say anything about the fact that they don't have to worry about it impacting with your ability to do your job or anything to that effect?
>
> A. Yeah, *because it doesn't affect me driving a truck or working outside, stuff like that, absolutely, yeah*. I let them know it doesn't affect me.
>
> Q. It doesn't affect your ability to do the job.
>
> A. Right, yes. *It's only affected me in one place in my life*.
>
> Q. And I assume you're going to tell me that's at the Village of Milford?
>
> A. *Wastewater*, yeah.

LeMarbe dep., ECF No. 45-2, PageID.978 (emphasis added).  Contrary to the defendant's position, the plaintiff never testified that "the only thing he was unable to do" was "eat a bowl of soup in public."  Instead, he testified that he had significant difficulties daily in his private life with activities such as dressing and tying his shoes, and at work he was unable to write legibly and, as previously described, with conducting the required procedures in the Wastewater laboratory.  LeMarbe dep., ECF No. 45-2, PageID.992.  Moreover, the portion of the deposition cited in the defendant's reply merely consists of a brief colloquy about how the plaintiff would explain his

tremors to potential employers in the context of a job interview, which he did by stating that it was a tremor condition, that it was not life threatening, and that it did not affect his ability to perform *the type of work to which he was accustomed*, involving such things as "driving a truck" or "working outside." He further testified that "the only place it affected him" was in his assignment to the Wastewater lab — i.e., merely that he never had problems performing other duties of jobs that he previously held; not that the condition had "no effect" on his life generally.

Nothing in that narrow exposition on how the plaintiff would explain his apparent tremors to potential employers contradicts the modestly more expansive clarifying testimony in his affidavit about how the tremors substantially limit many of his activities in private life. Other portions of the plaintiff's deposition that comprised cursory inquiries by defendant's counsel about the plaintiff's limitations are not contradictory to anything stated in his responsive affidavit, and the earlier testimony supplies no basis for excluding from consideration the clarifying testimony that the plaintiff has presented by way of rebuttal. Unlike in the cases cited by the defendant, there is no indication in the record that the plaintiff was asked point blank to elaborate on a particular topic and withheld crucial details that were advanced only later, in an affidavit. There is no basis for excluding the affidavit.

Finally, the defendant cites the recent unpublished decision in *McGonegle v. Select Comfort Retail Corp.*, No. 19-442, 2021 WL 229038 (S.D. Ohio Jan. 22, 2021), where the district court held that the plaintiff's essential tremors did not qualify as a disability. That case, however, readily is distinguishable because the plaintiff there positively testified that the tremors did not "substantially limit him in any way." *Id.* at *3 (S.D. Ohio Jan. 22, 2021) ("McGonegle [] stated during his deposition that he did not believe that his tremor substantially limited him in any way. At most, McGonegle testified that the tremor (1) causes him difficulty when 'trying to work with

little screws when [he] fix[es] toasters,' (2) makes it hard to write legibly 'at times' unless McGonegle focuses on his penmanship, and (3) forces McGonegle to take 'a little longer' to do manual tasks, like operating his car's rear window defroster."). The limitations that LeMarbe's tremors caused him were considerably more substantial and extensive.

### b. Regarded as Having a Disability

The plaintiff also has produced sufficient evidence for a jury to conclude that he was "regarded as" having a disability by the defendant's managers, Tom Harder (plaintiff's direct supervisor in the Wastewater Department), and Bob Calley (Director of Public Services for the Village). LeMarbe testified that his hand tremors immediately are apparent to anyone with whom he interacts who sees him handle any object with his hands. It is undisputed that, during the several weeks that he worked in the Wastewater lab, he frequently worked alongside coworker Heather Sherwood and his direct supervisor Tom Harder. He testified that he was unable to complete any of the procedures in the lab that he was called upon to perform, because his hand tremors prevented him from making precise measurements of handling chemicals without spills. Harder witnessed the plaintiff's hand tremors and resulting inability to do the work directly. LeMarbe dep. at PageID.993 ("[Harder] seen [sic] how difficult a time I was having with that. He was with me when I was pouring. He seen it. He was right next to me. If I pour that stuff with you, you'll see my struggle with it. He was seeing that daily."). Further, on February 20, 2019, LeMarbe had a meeting with Harder and Calley during which he again requested a transfer back to the garage on the ground that his hand tremors prevented him from working in the lab.

The fact that Harder regarded the plaintiff's impairment as an obstacle to his duties in the lab further is confirmed by Harder's statement to the plaintiff on the following day that the plaintiff was going to be "written up" for working too slow and being unable to get his work done in the lab — due to his hand tremors. Harder testified that he told LeMarbe on February 21, 2019 that

he was going to be written up for his "speed," i.e., being slow getting work done in the lab, and that LeMarbe's response was telling Harder that if he was written up he would "sue for a disability" based on his hand tremors.  Thomas Harder dep., ECF No. 45-7, PageID.1111.  After a heated discussion about the potential write up, Harder told LeMarbe to go home, and said that the problem would be dealt with in the morning.  About an hour later, Harder called Calley and discussed the confrontation with him.  That testimony is sufficient to support an inference that Calley also knew about the hand tremors and their effect on LeMarbe's work in the lab.

Calley subsequently called Wuerth the next morning to discuss the situation with LeMarbe, but during that discussion Calley reported only that LeMarbe had made "threats" to coworkers, including Sherwood and others, and no mention of his "speed" in the lab was made.  Wuerth then "dictated" an administrative leave memo to Calley over the phone, telling him "what should be in it."  Wuerth dep., ECF No. 45-8, PageID. 1116.  The full significance of the tactical shift in the disciplinary process is discussed further below.  However, for the purpose of the "regarded as" showing, the change of tone at least justifies a reasonable inference that both Harder and Calley viewed the plaintiff's hand condition — and the initial, rapidly abandoned idea of disciplining him on the basis of having that condition — as problematic.  The fact that Calley immediately pivoted away from the idea of punishing the plaintiff for having an impairment that affected his ability to do his job only bolsters the conclusion that Calley viewed the condition as potentially entitling LeMarbe to some protection or accommodation.

Like the question whether a limitation of a life activity is "substantial," the question whether an employer perceived a limitation as impacting an employee's ability to work is an inquiry into the supervisory state of mind that rarely is amenable to disposition on a cold record. So it is here.  "'[I]n determining who may invoke the protection of the ADA, we do not always

look to the individual claiming discrimination; when that individual seeks to proceed under a 'regarded as' theory, we must look to the state of mind of the employer against whom he makes a claim. Under the 'regarded as' prong of the ADA, membership in the protected class becomes a question of intent. And that question — i.e., the employer's motive — is one rarely susceptible to resolution at the summary judgment stage.'" *Meade Place*, 841 F. App'x at 970 (quoting *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001)); *see also id.* at 969 (acknowledging that "a 'regarded as' claim under the ADA requires only that there was a perceived impairment, not necessarily that the employer perceived the disability to limit a major life activity.")

Moreover, the plaintiff testified that he had numerous discussions with Calley and Harder during the months he was assigned to the Wastewater Department where he mentioned the anticipated difficulties in the lab due to his tremors, and, at least early on, Calley represented that the requested accommodation of a reassignment would be forthcoming. The offer to accommodate is in itself further evidence that the plaintiff was regarded as having a condition that warranted accommodation. *McGriff v. Beavercreek City Sch. Dist.*, No. 18-372, 2021 WL 2401921, at *7 n.2 (S.D. Ohio June 11, 2021).

The plaintiff has produced sufficient evidence to put the question of perception of an impairment by his supervisors to the jury.

## 2. Reasonable Accommodation

The defendant also argues that the request for accommodation was not reasonable because transferring LeMarbe back to his old job in the DPW garage was not a practical solution, since it would have meant "displacing another employee," which the ADA does not require.

"The [ADA] defines reasonable accommodation to include 'reassignment to a vacant position.'" *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020) (quoting 42 U.S.C. § 12111(9)(B)). "To show disability discrimination in the reassignment context, a plaintiff must show either that 'he requested, and was denied, reassignment to a position for which he was otherwise qualified' or that 'he requested and was denied some specific assistance in identifying jobs for which he could qualify.'" *Ibid.* (quoting *Burns v. Coca-Cola Enterprises Inc.*, 222 F.3d 247, 258 (6th Cir. 2000)).

Here, there is ample evidence to support a finding that the plaintiff's request for reassignment was reasonable. First, LeMarbe testified that Calley repeatedly told him, including before he was transferred to the Wastewater Department, that the accommodation requested would be granted, and that it would be forthcoming in a matter of weeks. Calley evidently soured on the prospect of having LeMarbe transferred back to his command after some time — perhaps because he grew annoyed by the plaintiff's repeated requests for the promise to be fulfilled, which eventually boiled over into Calley's profane tirade against the request; or perhaps, as the plaintiff suggests, because Calley simply disliked the plaintiff and wanted to be rid of him, one way or another.

The defendant now takes the litigation position that a transfer was impractical because it would have "displaced" an employee in the garage, and there were "no jobs available" for the plaintiff to occupy in his former department. That position, however, is belied by the evidence that Calley explicitly represented that a transfer was forthcoming — i.e., that it was possible, practical, and would in fact be granted. Moreover, the plaintiff, who it appears is a former union representative, testified that under the terms of the CBA the requested transfer was permissible because the DPS Garage and the Wastewater Department were regarded as all one department,

- 23 -

and there were no bureaucratic obstacles to any shuffling of work assignments within the ambit of a single department — i.e., no "new job" or "vacancy" would need to be created for a simple reallocation of duties.  It also is evident that any "displacement" of a person assigned to the Garage would have been offset one-for-one with the opening of an assignment in the Wastewater Department that would have been vacated by the plaintiff.  There has been no showing that either of the persons who initially displaced the plaintiff could not have been reassigned — as Calley initially promised they would be — to allow LeMarbe to return to his former posting.

The defendant also contends that LeMarbe never "requested" an accommodation.  However, the plaintiff testified that he repeatedly — twice a month, every month after his transfer — asked to be transferred back to the DPS Garage, each time stating that he was apprehensive that his tremors would prevent him from performing the lab work to which he eventually would be assigned.  Those repeated requests, and the basis allegedly stated for them, are more than sufficient to justify a conclusion that the plaintiff's supervisors were on notice of his request for an accommodation.

"If an employee requests assistance in identifying vacant positions — even a request as generic as 'I want to keep working for you — do you have any suggestions?' — then 'the employer has a duty under the ADA to ascertain whether he has some job that the employee might be able to fill.'"  *Fisher*, 951 F.3d at 419 (quoting *Burns*, 222 F.3d at 257).  "The employee is not required to use magic words such as 'accommodation' and 'disability'; rather, we ask whether 'a factfinder could infer that [the interaction] constituted a request for an accommodation.'"  *Ibid.* (quoting *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)).  The Sixth Circuit has held that "the request does need to make it clear from the context that it is being made in order to conform with existing medical restrictions."  *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007).  But there

is ample evidence in the record that the requests here did so, where the plaintiff testified that he repeatedly asked for the promised reassignment on the basis that his hand tremors would make it impossible for him to perform anticipated duties that he would be required to undertake in the Wastewater lab.  The plaintiff's serial requests to be reassigned to a position in the DPS Garage are sufficient for a fact finder to infer that the plaintiff's supervisors were aware of his request for an accommodation.  *Fisher*, 951 F.3d at 412, 419.

The defendant also contends that no request for accommodation properly was presented in the first instance because the plaintiff did not supply a "doctors note" or other "medical records" as backup to establish the "medical necessity" of the requested reassignment.  True enough, the Sixth Circuit "consistently [has] held that an employer is 'not obligated to provide accommodation until [the] plaintiff had provided a proper diagnosis of [her disability] and requested specific accommodation.'"  *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 670 (6th Cir. 2020) (quoting *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998)).  Nor must an employer "take the employee's word for it that the employee has an illness that may require special accommodation [and] has the ability to confirm or disprove the employee's statement.'"  *Ibid.* (quoting *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2000) (quotation marks omitted)).  But there is no indication in the record that the defendant ever *requested* any medical substantiation for the plaintiff's condition before denying his request — or before proceeding summarily to terminate him in lieu of an accommodation.  The cases such as *Kirilenko* recognize as a general matter that during the "interactive process" of negotiating an accommodation an employer legitimately may request medical information to substantiate a disability and any asserted work restrictions.  There is no legal authority, however, for the defendant's overly broad misconstruction of that principle into a supposed rule that an *initial*

*request* must be substantiated by a "doctor's note" or any other medical documentation in order to put the employer on notice that an accommodation is being requested.

The record contains sufficient evidence on the "reasonable accommodation" element of the plaintiff's ADA discrimination claim to withstand summary judgment.

### B. Retaliation

Milford argues that the plaintiff's retaliation claim must fail because there is no evidence that the plaintiff engaged in protected activity or that any protected activity motivated the discharge. Milford also contends that it had a legitimate reason for terminating LeMarbe's employment.

LeMarbe does not contend that there is direct evidence that his termination was due to his threats to complain to the EEOC. Instead, he relies on circumstantial evidence, which invokes the *McDonnell Douglas* burden-shifting framework. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 661 (6th Cir. 2020) (citing *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)). The plaintiff first must present a *prima facie* case, then the defendant must offer a legitimate, non-retaliatory basis for the adverse employment action, whereupon the plaintiff must offer evidence that the proffered reason was a pretext for unlawful retaliation. *Ibid.* (citations omitted).

The *prima facie* case for retaliation under the ADA consists of proof that the employee (1) "engaged in a protected activity, (2) the employer knew of the exercise of the protected right, (3) the employer took adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment by a supervisor, and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021) (citing *Morris v. Oldham Cnty. Fiscal Ct.*, 201

F.3d 784, 792-93 (6th Cir. 2000); *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007); *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997)).

The parties do not dispute that threatening to file an EEOC charge and requesting an accommodation for a disability both are textbook examples of protected activity for the purposes of a retaliation claim. *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."). The Sixth Circuit also has noted that "this circuit and most others agree that requests for accommodation are protected acts." *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013). The defendant contends that it was "unclear" what the plaintiff meant when he threatened to "file an EEOC charge," but the plaintiff's testimony is sufficient to support a finding that his intent to sue clearly was stated. The sole element of the *prima facie* retaliation claim seriously in dispute here is causation.

### 1. Causation

The plaintiff has presented ample evidence from which a jury could conclude that the imposition of forced leave and instigation of an investigation into charges of "intimidation" were causally connected with the plaintiff's February 20, 2019 request for an accommodation (the last in a long series of such requests), and his threat to "file an EEOC charge" in response to the threat by Harder to invoke discipline for his inability to perform his lab duties because of his hand tremors.

First, the imposition of administrative leave occurred on the day after LeMarbe made his final request for an accommodation, and the threat to sue if he was disciplined. The immediacy of the events in itself supports an inference of causation in this case. The Sixth Circuit "has determined that a two-to-three-month period between protected activity and adverse employment

action was sufficient to establish a causal connection." *Frazier v. Richland Public Health*, 685 F. App'x 443, 455-56 (6th Cir. 2017) (citing *Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) (two months); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (three months)). Here, the allegedly retaliatory action came hard on the heels of the protected activity, within 24 to 48 hours. Far longer lapses have been found in several decisions to support an inference of causation. *E.g.*, *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 513 (6th Cir. 2016) (affirming judgment for plaintiff on Title VII retaliation claim with three weeks between protected conduct and termination).

Second, "[a]lthough a plaintiff cannot rest solely on temporal proximity to establish pretext, 'suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence.'" *Wyatt*, 999 F.3d at 421 (quoting *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012)). The timing in this case certainly is suspicious, particularly in the context of the basis for the invocation of administrative discipline. Harder admitted that he called Calley and reported the discussion about "writing up" the plaintiff based on his slow work in the lab, and he also relayed the threat to "sue for a disability" if that action was taken. It readily may be inferred that Harder and Calley swiftly abandoned that plan since, for obvious reasons, attempting to discipline the plaintiff for being unable to perform his job due to a disability, for which he repeatedly had requested accommodation, was unlikely to produce any salutary result from Calley's point of view. Instead, with no intervening incident or explanation, the rationale for the discipline pivoted overnight from poor work performance to "intimidation" of coworkers. "When the employer proceeds along lines previously contemplated," the Court "must not take the temporal proximity of the adverse employment action as evidence of causality"; but "if the adverse employment action is unlike the [course of] action previously contemplated or does not occur on

the schedule previously laid out, then the temporal proximity of the adverse action to the protected conduct is certainly evidence of causation." *Wyatt*, 999 F.3d 400, 421 (quoting *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) (quotation marks omitted)). The abrupt and otherwise inexplicable course correction after the discussion between Harder and Calley is further corroboration of retaliatory animus on Calley's part.

Third, other circumstances in the record also support the causal inference. Calley previously abruptly had shifted from assurances that the requested accommodation would be granted to an irate refusal to grant any accommodation, based on his evident annoyance at LeMarbe's repeated requests for Calley to make good on his promise. Calley's earlier outrage reasonably may be viewed as part and parcel of a determination simply to deny the plaintiff what he had been promised, particularly given the nexus between the prior hostile reaction, the initial, rapidly abandoned basis for the invocation of discipline, and the temporal immediacy of the threat to sue and the final accommodation request preceding the invocation of discipline on a different basis. Further, the evidence that Calley mispresented the basis for the discipline in his subsequent conversations with Wuerth further supports an inference that the retaliatory conduct was motivated by the protected activity and not by the nominally expressed concerns about "intimidation." As the plaintiff points out, Calley stated in his February 22, 2019 administrative leave memo that he was "made aware" of incidents of alleged intimidation "yesterday afternoon." Memorandum dated Feb. 22, 2019, ECF No. 45-9, PageID.1129. But Calley testified at his deposition that he was aware of all the alleged incidents between LeMarbe and Heather Sherwood before February 26, 2019, the various run-ins were not regarded as serious, and that the two were working with Harder to iron out their differences and were "trying to keep management out of it." Robert Calley dep., ECF No. 45-4, PageID.1062. Calley further admitted that, despite his earlier awareness of the

incidents, he never undertook any further investigation of any allegations of physical confrontations with other employees before February 26, 2019, when he solicited statements from Sherwood and other employees (which occurred after LeMarbe already had been placed on administrative leave).

There also is evidence that Calley was deceptive in his communications with Wuerth when initiating the administrative leave process. Harder testified that he told LeMarbe on February 21, 2019 that he was going to be written up for being slow getting work done in the lab, and that LeMarbe's response was telling Harder that if he was written up he would "sue for a disability" based on his hand tremors. After a heated discussion about the potential write up, Harder told LeMarbe to go home, and said that the problem would be dealt with in the morning. About an hour later, Harder called Calley and discussed the confrontation. Calley subsequently called Wuerth the next morning to discuss the situation with LeMarbe, but during that discussion Calley reported only that LeMarbe had made "threats" to coworkers, including Sherwood and others, and no mention of his "speed" in the lab was made, nor was there any hint of LeMarbe's threat to sue over the denial of accommodation for his disability. Wuerth admitted that Calley did not inform Wuerth about LeMarbe's February 21, 2019 statement that he would sue the Village over the failure to accommodate his disability, even though a diary of departmental incidents that was kept by Harder memorialized the threat to sue. During the phone call with Calley, Wuerth then "dictated" an administrative leave memo to Calley over the phone, telling him "what should be in it." Wuerth dep. at PageID.1116. Evidence of Calley's deceptive representations during the phone call that instigated the disciplinary process further bolsters an inference that the disciplinary process was invoked for reasons other than those nominally stated. *Weatherspoon v. Rock Constr. Co.*, No. 18-13068, 2019 WL 5212217, at *6 (E.D. Mich. Oct. 16, 2019).

Evaluating "the totality of the circumstances," *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400-01 (6th Cir. 2010), the plaintiff has put forth ample evidence to support the inference "that the 'unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer,'" *Mys v. Michigan Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

### 2. Knowledge

The defendant also argues that causation cannot be established because the "ultimate decision maker" — Village Manager Christian Wuerth — was "unaware" of the protected activity until after the "wheels already were in motion" on the administrative discipline process. That argument, however, overlooks the fact that the termination is not the only "adverse action" at issue in this case. In the context of a retaliation claim, the instigation of an investigation and invocation of the disciplinary process in the first instance may qualify as an adverse action, regardless of the ultimate outcome. The Sixth Circuit has observed that "the definition of adverse action is essentially the same" for ADA retaliation claims as that applied to retaliation claims under the First Amendment, namely, that "any action that would deter a person of ordinary firmness from exercising protected conduct will" constitute a sufficient adverse action. *Wenk v. O'Reilly*, 783 F.3d 585, 595 (6th Cir. 2015) (citing *Wurzelbacher v. Jones–Kelley*, 675 F.3d 580, 583 (6th Cir. 2012)). Gratuitous investigations — and even mere false reports that could prompt such investigations — can qualify as "adverse actions" in the context of retaliation claims. *Shelby County*, 711 F.3d at 698. It is undisputed here that Calley either was a sole or joint "decision maker" (perhaps in collaboration with Harder) in initiating the investigation and requesting discipline for the supposed intimidation of coworkers.

As discussed above, there is evidence from which a jury could conclude that both Calley and Harder were well aware of the plaintiff's protected activity before the disciplinary process was

invoked.  It is settled law that an employment decision cannot be considered retaliation for protected activity if the decision-maker did not know about the alleged protected activity.  *Mulhall v. Ashcroft*, 287 F.3d 543, 552-553 (6th Cir. 2002); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999).  However, direct evidence of knowledge by the decision-maker is not required; "a plaintiff may survive summary judgment by producing circumstantial evidence to establish this element."  *Mulhall*, 287 F.3d at 552; *see Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999); *Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 531 (6th Cir. 1989).  "[K]nowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action."  *Id.* at 553 (citing *Kralowec v. Prince George's County*, 503 F. Supp. 985, 1010 (D. Md. 1980), *aff'd*, 679 F.2d 883 (4th Cir.), *cert. denied*, 459 U.S. 872 (1982)).  Here there is circumstantial evidence from which a jury could find that before he initiated the disciplinary proceeding Calley was well aware of the immediately preceding threat to sue from his discussion with Harder, in addition to ample direct testimony by the plaintiff that Calley was aware of the plaintiff's numerous prior requests for an accommodation.

Moreover, even as to the termination itself, Calley's bad intent can be imputed to Wuerth under the so-called "cats-paw" theory of liability.  That applies when a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.  "[T]he term 'cat's-paw' refers to one used by another to accomplish his purposes.  In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action."

*Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 377 (6th Cir. 2017) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006)).

"A plaintiff alleging liability under the cat's paw theory seeks 'to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.'" *Ibid.* (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415(2011)).  Of course, "[i]f the decisionmaker conducts an investigation that 'results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable.'" *Id.* at 380 (quoting *Staub*, 562 U.S. at 421).  However, "there is no 'hard-and-fast rule' that a decisionmaker's independent investigation defeats a cat's paw claim." *Ibid.*  Instead, "an independent investigation defeats a cat's paw claim only when the investigation 'determin[es] that the adverse action was, apart from the supervisor's recommendation, entirely justified.'" *Ibid.*  The Sixth Circuit has acknowledged the cat's paw theory of liability as an applicable rule of decision for disability discrimination claims under the ADA and Michigan state law. *Gjokaj v. United States Steel Corp.*, 700 F. App'x 494, 505 (6th Cir. 2017).

In this case, Wuerth admitted that at least one of the incidents cited in the termination memo was unsubstantiated by the information that was presented to him, and he also admitted that the bases for other incidents were unknown to him or were derived solely from reports that were procured by Calley, or from file notes produced solely by Calley or Harder.  Wuerth testified about the employee statements he reviewed that led to the termination.  Heather Sherwood provided a statement dated February 26, 2019, which Calley had told her to write up, summarizing "incidents" that she recalled with LeMarbe.  In the statement, Sherwood reported that the December 28, 2018 incident she understood to be a threat that LeMarbe would report her to DPS supervisors for bothering him about calling in sick because he did not want to work in the lab.  Wuerth admitted

- 33 -

that the December incident was reported as an "argument" that did not involve any threat of physical violence, and that it would be permissible for an employee to report a coworker to supervisors over a work-related argument.  Wuerth also testified that he never heard any other complaints from Sherwood about incidents with LeMarbe until he told Calley to solicit statements from employees about incidents with LeMarbe.  Wuerth had a meeting with LeMarbe on March 14, 2019, to discuss the allegations of threats and intimidation, and during that discussion LeMarbe denied ever physically intimidating or threatening coworkers with physical violence, and he also denied the other allegations against him.  Wuerth admitted that he could not recall the source of information for the allegation that LeMarbe had told Tom Harder that Sherwood was dishonorably discharged, but he supposed the information must have come from notes submitted to him by Harder.

Wuerth's deposition testimony, along with the fact that the leading incident that supposedly justified the termination admittedly was unsubstantiated by information that Wuerth considered, justifies a finding that Wuerth undertook no substantial independent investigation of the allegations, but merely rubber stamped the charges made by Calley, relying largely or entirely on information procured or produced by Calley and Harder.  Thus, there is a sufficient basis in this record on which a jury could impute Calley's malignant intent to Wuerth, regardless of whether Wuerth himself harbored any ill motive.

\* \* \* \* \*

The plaintiff has established a *prima facie* case for retaliation.  The defendant has offered non-discriminatory reasons for its adverse employment actions.

### 3. Pretext

For the same reasons discussed above, and others, there is sufficient evidence in this record from which a jury could find that the stated reasons for the termination were pretextual.  "To

establish pretext, [the employee] must show that the legitimate nondiscriminatory reason (1) had

no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to warrant

[his] removal." *Wyatt*, 999 F.3d at 421.

First, as discussed earlier, a jury could conclude that the leading charge in the grounds for

termination — that LeMarbe had intimidated Heather Sherwood during an argument on December

28, 2018 — was entirely unsupported by the report of the incident provided by Sherwood and

reviewed by both Calley and Wuerth.   That evidence adequately suggests that the leading

allegation in the termination notice had no basis in fact.

Second, there is evidence from which a jury could find that none of the other reported

confrontations previously had been regarded by anyone involved, including Calley or Harder, as

warranting either an investigation or discipline — that is, at least not until after Harder and Calley

determined on February 20, 2019 to manufacture an alternative basis to squash the plaintiff's

vexatious demands for an accommodation.   Calley testified that he was aware of the alleged

confrontations with Sherwood before February 26, 2019, but it had been reported to him that the

run-ins were not serious and Sherwood and LeMarbe were working with Harder to iron out their

differences, and they were "trying to keep management out of it."   Calley dep., ECF No. 45-4,

PageID.1062.   He also admitted that he never undertook any further investigation of the incidents

with Sherwood or any other allegations of physical confrontations with other employees before

February 26, 2019, when he solicited statements from Sherwood and other employees, after

LeMarbe had been placed on administrative leave.

Heather Sherwood testified that she did not regard anything in the December 28, 2018

confrontation with LeMarbe as involving any physical threat or intimidation.   Instead, she

understood his remark to mean that he would report her to supervisors for bothering him about his

use of sick time.  She testified, however, that during the second confrontation on February 7, 2019, during an argument about Sherwood's attempts to train LeMarbe on lab procedures, LeMarbe had "bulked up," and "walked toward me and asked if I wanted to fight," which she felt was physically intimidating.  Heather Sherwood dep., ECF No. 45-3, PageID.1047.  However, the two then "backed up," and "began to get loud and argue." *Ibid.*  But Sherwood also testified that she did not report the confrontation to anyone, but later, after LeMarbe went to talk to Calley about difficulties with Sherwood in the lab, there was a discussion between the three which resulted in "[coming] up with another training plan." *Ibid.*  Sherwood testified that "there was not another incident after that." *Ibid.*

As to the accusation that Sherwood was dishonorably discharged, LeMarbe testified that he never told anyone that Sherwood had a substance abuse problem, and, as a recovering alcoholic, he would not have spread such rumors or allegations, because he "believe[s] in anonymity," due to his own struggles with alcohol dependency and recovery.  LeMarbe dep. at PageID.994. LeMarbe testified that another coworker had spread rumors about Sherwood, and Harder had repeated the rumors to LeMarbe, but LeMarbe did not repeat them himself.

That evidence is sufficient to support the inference that the charges against LeMarbe either were drawn out of whole cloth or substantially embellished and exaggerated by Calley in order to supply a basis for termination: the same incidents either were unsubstantiated by the information supplied by the persons involved, or previously were known to Calley but not regarded as justifying termination, or any attempt to pursue lesser discipline.  That is enough to put to the jury the plaintiff's claim that the proffered bases for his termination were merely pretextual. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 396 (6th Cir. 2008).

III.

There is sufficient evidence in the record for a jury to conclude that the plaintiff was disabled or regarded as disabled by his supervisors, that he requested an accommodation for his condition that was reasonable, and that his reasonable request ultimately was denied for petty and vindictive reasons. There also is sufficient evidence in the record from which a jury could find that the forced leave and subsequent termination were motivated by managerial hostility to the plaintiff's repeated requests for an accommodation or for threats to sue for one rather than any genuine grounds for discipline, and that the stated reasons for the termination were factually false and pretextual. Fact issues, therefore, preclude summary judgment for the defendant.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment (ECF No. 42) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: October 26, 2021